**FIRST NATIONAL BANK IN DALLAS,**
Executor of the Estate of George
Pattullo, Deceased

v.

The **UNITED STATES.**

Lucile W. **PATTULLO**

v.

The **UNITED STATES.**

Nos. 52–66, 53–66.

United States Court of Claims.

Jan. 23, 1970.

Maurice E. Purnell, Dallas, Tex., for plaintiffs; John D. Heckert, Washington, D. C., attorney of record, A. E. Aikman, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., and McClure & Trotter, of counsel.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Knox Bemis, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

LARAMORE, Judge.

In these suits, the First National Bank in Dallas, as executor of the estate of George Pattullo, and Lucile W. Pattullo (his widow), seek recovery of Federal excise taxes and interest paid by the Pattullos, individually, with respect to their purchases of certain stocks of Canadian corporations in late 1963 and early 1964. The dispositive issue involves the constitutionality of the Interest Equalization

Tax Act of 1964 [1] as applied to the transactions here involved. The facts are stipulated and will be summarized here only to the extent necessary to explain the basis for our decision that plaintiffs are not entitled to recover.

On July 18, 1963, President John F. Kennedy delivered to both Houses of Congress a message [2] wherein he proposed an "interest equalization tax," the purpose of which was to alleviate the United States balance of payments problem by restricting long-term capital outflow from the United States.

The proposed tax was to be levied on purchases of foreign securities by United States persons from foreign persons. The effective rate of the tax was to be 15 percent of the value of equity securities, and from 2.75 percent to 15 percent of the value of debt obligations not maturing within three years. Foreign securities purchased from United States persons were to be exempt.

In his message to Congress, President Kennedy explained, with respect to the timing of the proposed tax, that: [3]

> * * * Since the effectiveness of this tax requires its immediate application, I am asking Congress to make the legislation effective from the date of this Message. * * *.

After the President addressed Congress, and his message was made public, prices of stocks and bonds dropped on foreign exchanges, especially those in which Japanese or Canadian securities were traded. Other markets reflected a strengthening in the position of the dollar, and a rise in the prices of United States bonds and Treasury bills.

After July 18, 1963, it was general knowledge among dealers and brokers in stocks and bonds, both in the United States and abroad, that the Kennedy administration had recommended a tax, applicable from and after July 19, 1963, upon the purchase by United States persons of foreign stocks and bonds. It was also the practice of brokers and dealers in stocks and bonds to advise United States persons who wished to buy foreign stocks and bonds that such purchases (from non-United States persons) would be subject to the interest equalization tax if the pending bill were enacted with the effective date proposed by the President. Extensive publicity was given by the press to the President's proposed interest equalization tax, and to the proposed immediate effectiveness of the tax.

On the day of the presidential message, the United States Treasury Department issued a 25-page "Detailed Explanation of the Interest Equalization Tax," and a 6-page "Information on Proposed Interest Equalization Tax" with pertinent exemption certificates attached. Each document contained a description of the tax as proposed by President Kennedy, and each was made available to the press and the general public, and sent to members of the New York Stock Exchange. Subsequently, in the Federal Register of August 16, 1963, the Treasury Department published a "Notice of Proposed Effective Date" of the interest

---

1. The Interest Equalization Tax Act of 1964 (P.L. 88–563, 78 Stat. 809, adding chapter 41 to sub-title D of the Internal Revenue Code of 1954) 26 U.S.C.A. § 4911 et seq., provides in section 2, pertinent here, as follows:

 (a) *In General.*—There is hereby imposed, on each acquisition by a United States person * * * of stock of a foreign issuer, or of a debt obligation of a foreign obligor * * *, a tax determined under sub-section (b).

 (b) *Amount of Tax.*—

 (1) *Stock.*—The tax imposed by subsection (a) on the acquisition of stock shall be equal to 15 percent of the actual value of the stock.

 * * * * *

 (c) *Effective Date.*—

 (1) *General Rule.*—* * * [T]he amendments made by this section shall apply with respect to acquisitions of stock and debt obligations made after July 18, 1963.

2. H. Doc. No. 141, 109 Cong.Record, Part 10, p. 12806 (Senate), and 109 Cong. Record, Part 10, p. 12940 (House of Representatives).

3. 109 Cong.Record, Part. 10, pp. 12809, 12943.

equalization tax bill (H.R. 8000, 88th Cong., 2d Sess.). This notice stated that the tax was proposed to apply (with certain specified exceptions) to acquisitions of stock and debt obligations made after July 18, 1963. This Federal Register notice also set out a general description of the provisions of the proposed tax and of the exemptions from its coverage.

The application of the proposed tax to transactions on national securities exchanges in the United States was postponed until August 19, 1963, in order to allow representatives of the Treasury Department and of the exchanges to work out the technical problems for procedures adapted to the proposed tax and its proposed retroactive application. Beginning August 19, 1963, the exchanges instituted procedures whereby a foreign security was subject to normal exchange trading only if the seller was a United States person so that the transaction would not make the buyer liable for the proposed tax. The sale of a foreign security by a seller who was not a United States person could be made only by a special contract, pursuant to an offering stating: "buyer subject to Interest Equalization Tax." (On the New York Stock Exchange such a sale was designated on the ticker tape by the symbol "F.").

On August 22, 1963, the Toronto Stock Exchange put into operation a second market, called the "Foreign Market," to handle all transactions between United States sellers and United States buyers of Canadian stocks, such sales being exempt from the proposed interest equalization tax. All 1,100 stocks listed on the Toronto Stock Exchange could be traded on this Foreign Market. Bid and asked quotations on the Foreign Market were recorded at each trading post alongside the quotations for the regular market. Foreign Market purchase orders and sales orders were distinctively colored, and all floor slips for these transactions were stamped with the symbol "z". Also, records of Foreign Market transactions carried the prefix "z" on the Toronto Stock Exchange ticker tape.

The Interest Equalization Tax Act was signed into law on September 2, 1964; it contained the above-detailed proposed provisions, which were outlined in the presidential message, without significant change.

George Pattullo was born in Canada in 1880, and lived there until 1906 when he moved to the United States. Mr. Pattullo remained a British subject, however, until 1917 when he was naturalized a United States citizen. In 1913, he married Lucile Wilson, of Dallas, Texas, and throughout their marriage the Pattullos lived in Texas or New York. George Pattullo died July 29, 1967, in New York City, where the Pattullos had resided for many years; he was survived by his wife, Lucile.

For many years, including 1963 and 1964, both George Pattullo and Lucile Pattullo had accounts with Baker, Weeks & Co., a stock brokerage and investment advisory firm with its main office in New York City, as well as offices in Toronto and Montreal. James A. Edgar, a close personal friend of George Pattullo, and Thomas F. Bohen, both of Baker, Weeks & Co., acted as brokers for George Pattullo, who at all times made his own decisions as to what stocks he wanted to buy or sell. George Pattullo also gave instructions to these brokers as to the stocks to be bought or sold for the account of Lucile W. Pattullo.

During the last months of 1963 and the early months of 1964, George Pattullo gave instructions to Mr. Bohen or Mr. Edgar for purchase of stocks in certain Canadian corporations. When George Pattullo said that he wanted to buy these stocks, Mr. Bohen and Mr. Edgar informed George Pattullo that there was pending before the United States Congress a proposed tax called the Interest Equalization Tax, which was proposed to be made retroactive, and if enacted as proposed, would apply to the purchase of foreign securities by United States citizens. Notwithstanding what Mr. Edgar and Mr. Bohen told him, George Pattullo gave them orders to purchase the Canadian stocks on the Toronto Stock Ex-

change for his account and for his wife's account. Mr. Edgar, or Mr. Bohen, transmitted these orders to the Toronto office of Baker, Weeks & Co., which then executed the orders on the Toronto Stock Exchange.

During 1963 and 1964, George Pattullo maintained a United States dollar account and a Canadian dollar account in the Agency Bank of Montreal in New York City, and also a Canadian dollar account in the Toronto branch of the Bank of Montreal. When the Toronto office of Baker, Weeks & Co. executed the purchase orders for Canadian stock for George Pattullo, it charged his account styled "Canadian Funds Account" in Canadian dollars. (George Pattullo also had an account with Baker, Weeks & Co. in New York styled "United States Funds" account, to which were charged his purchases of United States securities.) Upon receipt of the stock certificates pursuant to the purchase orders, the Toronto office of Baker, Weeks & Co. would deliver the certificates to the Bank of Montreal, Toronto Branch, against payment by the Bank of Montreal, which would charge the payment to George Pattullo's Canadian dollars checking account in the Toronto branch of the Bank of Montreal. Upon such delivery and payment, the "Canadian Funds Account" with the Toronto office of Baker, Weeks & Co. would be credited with the payment received from the Bank of Montreal. The certificates were held by the Bank of Montreal in a "Safekeeping" account for George Pattullo. Lucile W. Pattullo had similar accounts with the Toronto office of Baker, Weeks & Co. and with the Toronto branch of the Bank of Montreal, and the procedures described above were followed with respect to purchases of Canadian stocks made for her.

During the period under review, George Pattullo purchased stocks in Canadian corporations in the total amount of $334,928.12; the initial purchase took place on November 13, 1963, and the final purchase took place on February 12, 1964. Prior to any of the subject purchases, on July 18, 1963, Mr. Pattullo owned Canadian funds in the amount of $399,503.15, all of which, except for $9,893.28, was on deposit in Canada. After the last of the subject purchases, on March 5, 1964, he owned Canadian funds in the amount of $221,493.12, all of which was on deposit in Canada. Mr. Pattullo's Canadian dollar account in Canada had been replenished, in large part, by proceeds from the conversion, on November 7 and 12, 1963, of $175,000 from his United States dollar account in New York City.

Lucile Pattullo, during the period under review, purchased stocks in Canadian corporations in the total amount of $227,806.24; the initial purchase occurred on November 14, 1963, and the final purchase occurred on February 13, 1964. Mrs. Pattullo owned $560,232.13 in Canadian funds on deposit in Canada on July 18, 1963, and $482,963.57 on March 16, 1964. Mrs. Pattullo's Canadian dollar account in Canada had likewise been replenished, in part, by proceeds from the conversion, on March 2, 1964, of $75,000 from her United States dollar account in New York City.

The Pattullos filed Interest Equalization Tax Returns in December, 1964, reporting the Canadian stock purchases they had made from November, 1963 through February, 1964, and paid the amounts shown to be due on the returns. On June 2, 1965, claims were filed for refund of the taxes so paid, on the asserted ground that the retroactive application of the tax to the subject purchases was unconstitutional.[4] The Com-

---

4. On March 8, 1965, George Pattullo filed a claim for refund of the $2,563.66 in interest equalization tax he had paid with respect to his purchase of 1,000 shares of Calgary and Edmonton Corp., Ltd., stock in November, 1963. On October 22, 1965, Mr. Pattullo was refunded the $2,563.66 pursuant to his claim for refund on the ground that Calgary and Edmonton Corp., Ltd. satisfied the requirements of section 4920(a) (8) of the 1954 Code, and accordingly was not subject to the interest equalization tax.

missioner of Internal Revenue did not allow these claims; whereupon, after six months, the Pattullos brought these suits.

Plaintiffs contend that the interest equalization tax, as retroactively applied to the transactions here involved, is unconstitutional because, as so applied, the tax (1) violates the due process clause of the Fifth Amendment, (2) represents unauthorized legislation by the Executive, and (3) constitutes an invalid unapportioned direct tax. It is our view that plaintiffs' positions are not well taken; we hold that the Interest Equalization Tax Act, as applied to the subject purchases, is not unconstitutional under any of the theories advanced by plaintiffs.

## I

■ Plaintiffs initially assert the unconstitutionality of the interest equalization tax on the ground that its retroactive application here is arbitrary and capricious, and constitutes a deprivation of property without due process of law in violation of the Fifth Amendment to the United States Constitution.[5] This is so, plaintiffs urge, irrespective of the quantity or quality of non-statutory notice given prior to enactment regarding the retroactive effect of the tax. We do not agree.[6]

Retroactivity in a tax statute by no means represents a novel occurrence. To the contrary, cases which have dealt with the issue are numerous, and it cannot be gainsaid that such retroactivity is sanctioned in proper circumstances. Thus, the disagreement between the parties here centers largely on whether the circumstances surrounding the instant tax are such that its retroactive application is constitutional.

■ It is well settled that an *income* tax statute may be given retroactive effect without violating the Constitution.

Brushaber v. Union Pacific R. R. Co., 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493 (1916); Cooper v. United States, 280 U.S. 409, 50 S.Ct. 164, 74 L.Ed. 516 (1930); Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938); Gillmor v. Quinlivan, 143 F.Supp. 440 (N.D. Ohio 1956). An examination of this principle reveals certain motivating considerations. Initially, there is the revenue-raising purpose of income tax statutes, which purpose is of paramount importance to the continued functioning of government. An income tax is levied, moreover, upon the proceeds of an "involuntary" act; that is, it is generally assumed that a taxpayer will generate income, rather than refrain from so doing, irrespective of the imposition of a tax upon that income. And, perhaps of greatest importance, because the income tax has become a recognized fact of life, taxpayers are presumed to be on notice.

Quite obviously, the considerations underlying different types of tax statutes are not uniform. Indeed, tax statutes commonly vary with respect to, *inter alia*, their underlying congressional intent, the transactions or interests upon which they are levied, their economic purpose, and perhaps even their social function. Nevertheless, near exclusive reliance upon the above-detailed considerations incident to *income* tax statutes is evident when plaintiffs enunciate the rigid tripartite standard which they consider to be the touchstone of valid retroactivity for *all* tax statutes. This standard, which plaintiffs claim to be the distillate of the decided cases, is that retroactivity in a tax statute is sanctioned *only* if (1) the tax is primarily a revenue measure, or (2) the tax is not imposed on some voluntary act, or (3) the taxpayer is forewarned of such retroactivity *by the statute books or repeated congressional practice*. The limitation inherent in

---

5. The Fifth Amendment to the Constitution of the United States provides, in pertinent part:

   "No person shall * * * be deprived of life, liberty, or property, without due process of law; * * *."

6. The factual posture of the suits now before us obviates the need to reach the question whether the retroactive application of a tax statute of the type here involved is constitutional where no pre-enactment notice is given regarding the statute's retroactive effect.

plaintiffs' standard, as we understand it, is that a new type of tax, primarily regulatory in nature and imposed upon a voluntary taxpayer act, may *never* validly be given retroactive effect.

■ We perceive no such rigid standard of constitutionality in the decided cases, nor do we recognize the limitation inherent in the alleged standard. *See,* Milliken v. United States, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 (1931); United States v. Hudson, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370 (1937); Welch v. Henry, *supra.* We are guided, rather, by the more flexible criteria delineated by the Supreme Court in Welch v. Henry, *supra,* 305 U.S. at page 147, 59 S.Ct. at 126:

> \* \* \* In each case it is necessary to consider the *nature of the tax* and the *circumstances in which it is laid* before it can be said that its retroactive application is *so harsh and oppressive* as to transgress the constitutional limitation. [Emphasis supplied.]

Accordingly, it is our view that where there is reasonable cause to believe or expect that a tax will be imposed upon a presently nontaxable transaction, the retrospective application of such tax does not constitute a denial of due process.[7]

There can be little doubt, on the facts of the instant suits, as to the pervasiveness or the efficacy of the forewarnings given. Indeed, the facts detailed above reveal not only numerous instances of general notice to the public regarding retroactive application of the proposed tax, but also communication of actual notice to plaintiffs to this effect. We do not believe that such widespread and effective notice is the stuff of which denial of due process cases are made. *See,* Sidney v. Commissioner of Internal Revenue, 273 F.2d 928 (2d Cir. 1960).

Nor do the early tax decisions of the Supreme Court relied upon by plaintiffs impart otherwise. *See,* Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927); Blodgett v. Holden, 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927); Untermyer v. Anderson, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928). In none of these cases was there any showing of prior notice that the estate tax or gift tax involved, respectively, would be made effective prior to the date of its enactment. A reading of the opinions in these cited cases, moreover, reveals that there was serious disagreement among the members of the Court as to whether the tax statutes there involved were even *intended* to apply retroactively.[8]

Perhaps of critical importance here, and consonant with the above-quoted "balancing test" excerpt from Welch v. Henry, *supra,* are the circumstances in which the subject tax was laid. Although the interest equalization tax would raise a not insignificant amount of revenue, it is clear that the primary pur-

---

7. *See,* Welch v. Henry, *supra,* wherein the Supreme Court distinguished earlier decisions, in which which retroactive tax statutes were held invalid, with these important words at 305 U.S. page 147, 59 S.Ct. at p. 125:

> " \* \* \* [D]ecision [there] was rested on the ground that the nature or the amount of the tax could not reasonably have been anticipated by the taxpayer at the time of the particular voluntary act which the statute later made the taxable event. [Citations omitted.] \* \* \*."

We are of the view that there was reasonable opportunity for the requisite anticipation in the suits now before us.

8. We have expressed our view that the above-cited cases holding unconstitutional the retroactive application of certain tax statutes are factually distinguishable in a significant sense from the suits now before us. We note in passing, moreover, that these early Supreme Court tax decisions, in which the Court was closely divided on the retroactivity issue, have since been frequently distinguished and narrowly limited; it is not entirely clear, in light of the above and the ever-increasing role of taxation in every area of activity, that the same result would obtain in these early cases were they before the Court today. *See,* Welch v. Henry, *supra,* 305 U.S. at 147, 59 S.Ct. 121; Sidney v. Commissioner, *supra,* 273 F.2d at 932.

pose of the tax was regulatory—to limit the outflow of long-term capital from the United States, and thereby alleviate the United States balance of payments problem. The retroactive aspect of the tax, moreover, was no mere embellishment; indeed, that aspect was a necessary prerequisite to the effectuation of the regulatory purpose. For if the interest equalization tax had not been proposed and enacted with retroactive effect, a premium would have been placed upon the consummation of "covered" transactions prior to the tax's enactment date. Far from relieving the balance of payments problem, such a prospect would have intolerably aggravated the problem. That the public purpose served by the procedures invoked at the time of, and prior to, enactment was of the highest order cannot seriously be questioned.

Nor can it be said, upon an objective view of the facts, that the retroactive application of the tax was "so harsh and oppressive as to transgress the constitutional limitation." Indeed, any limited restriction imposed upon the Pattullos' investment options, which restriction actually stemmed from the issuance of effective notice, can hardly counterbalance the serious national purpose underlying the subject tax. Accordingly, we hold that the interest equalization tax, as retroactively applied to the transactions here involved, does not violate the due process clause of the Fifth Amendment to the Constitution.

## II

Plaintiffs alternatively assert the unconstitutionality of the tax on the ground that its retroactive application constitutes the making of law by public announcement, also in violation of the due process clause of the Fifth Amend-

ment, and represents an encroachment by the President, in violation of the separation of powers, upon the legislative power vested in Congress by Article I, Section 1, of the Constitution.[9] This is so, plaintiffs continue, because the desired result (restriction of outflow of long-term capital) was accomplished, at least in part, prior to the enactment of the tax, owing to the fact that many people heeded the warnings and notices given that the proposed tax would be retrospectively applied. Though the operative facts are accurately portrayed by plaintiffs, the conclusions drawn are without justification.[10]

Clearly, there *was* no interest equalization tax until the enactment date, September 2, 1964. Implicit in plaintiffs' argument is the idea that pre-enactment notice that a proposed tax will be retrospectively applied effectively accelerates the enactment date, and invalidates the tax. In this plaintiffs are mistaken; their argument is contrary to the plain realities of the situation. The very warnings which plaintiffs characterize as unauthorized lawmaking represent, in fact, the elements of fairness, reasonableness, and equity in the suits before us.

The realities in these suits, as we view them, are that the Pattullos, with full knowledge of the pendency of a retroactive tax bill apparently applicable to their proposed transactions, chose to gamble that the bill would not become law, or that an exemption would be added covering their purchases. As subsequent events clearly have shown, the gamble was ill-advised. Now, plaintiffs disaffirm the notice that was given for *their* benefit and, instead, attack such notice as an unconstitutional usurpation of Congress' legislative power. This, plaintiffs

---

9. Article I, Section 1, of the United States Constitution provides as follows:
   "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

10. The constitutional authority for the statute in question lies in Article I Sec-

tion 8, wherein Congress is given the power to lay and collect taxes, to coin money and regulate its value, and to make all laws necessary and proper for carrying out the foregoing. *See also*, Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935); United States v. Doremus, 249 U.S. 86, 39 S.Ct. 214, 63 L.Ed. 493 (1919).

cannot do. Accordingly, we hold that preenactment notice of a proposed retroactive tax, followed by the enactment of such tax, does not constitute unauthorized legislation by public announcement.

### III

■ Plaintiffs further assert the unconstitutionality of the interest equalization tax on the ground that, as retroactively applied in the cases now under review, the tax violates the provisions of Article I, Section 2 and Section 9, of the Constitution that no direct tax shall be levied without apportionment.[11] Plaintiffs' position is necessarily based on the premise that an excise tax, when retroactively applied, is converted to a direct tax requiring apportionment to preserve its constitutionality. This position is not well taken.

It is not entirely clear what characteristics comprise a direct tax, and thus distinguish it from other, or indirect, taxes. At one time classification as a direct tax was synonymous with capitation or poll taxes and taxes on land, while later the issue became one of interpretation with policy considerations a dominant factor. *See,* Springer v. United States, 102 U.S. 586, 26 L.Ed. 253 (1880); Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895), *on rehearing,* 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108 (1895); Nicol v. Ames, 173

U.S. 509, 19 S.Ct. 522, 43 L.Ed. 786 (1899); Knowlton v. Moore, 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969 (1900). It *is* clear, however, that the burden of persuasion that a particular tax is direct lies upon the claimant of such fact. *See,* New York Trust Co. v. Eisner, 256 U.S. 345, 41 S.Ct. 506, 65 L.Ed. 963 (1921); Anniston Mfg. Co. v. Davis, 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143 (1937). Plaintiffs concede that a tax imposed upon the exercise of a privilege, as here, is an excise tax and not a direct tax. Yet, they urge that such a tax, when retroactively applied, is no longer a tax on the transaction, but rather an unconstitutional direct tax on the underlying property.

We fail to see, and plaintiffs provide no assistance in this regard, how the tax in question is distinguishable, in any meaningful sense, as a direct tax from other valid taxes levied upon the receipt or acquisition of property. *See,* Scholey v. Rew, 90 U.S. (23 Wall.) 331, 23 L.Ed. 99 (1874); Knowlton v. Moore, *supra.* Nor do we see how the mere retroactive application of a tax, conceded to be an excise imposed upon the exercise of a privilege, can convert such tax to a direct levy on property. Plaintiffs have failed to sustain their burden of persuasion and we hold, accordingly, that the interest equalization tax is not an unconstitutional direct tax.[12]

---

11. Section 2 and Section 9 of Article I of the United States Constitution provide, in pertinent part, as follows:

"§ 2. Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, * * *

"§ 9. No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken."

12. Plaintiffs assert for the first time, in their reply brief, that even if retroactive application of the interest equalization tax is constitutional, the tax is, nevertheless, inapplicable to the transactions here involved. This is so, plaintiffs urge, because the Pattullo purchases entailed no outflow of United States funds; therefore, the purchases had no adverse effect on the United States balance of payments. This argument is untimely as, indeed, plaintiffs' counsel conceded at oral argument.

We note in passing, however, that no discernible implication emerges from the clear wording of the tax provision pertinent here to the effect that the taxability of a "covered" transaction, turns on the nature of the funds used. The free convertibility between United States and Canadian dollars, and the instances of actual conversion of funds, moreover, strongly tend to refute even the factual basis of plaintiffs' position.