**Ralph E. PURVIS, Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 72–2001.**

United States Court of Appeals, Ninth Circuit.

July 18, 1974.

Ralph E. Purvis, in pro per.

David E. Carmack, Atty., Dept. of Justice (argued), Washington, D. C., for defendant-appellee.

Before MERRILL and WALLACE, Circuit Judges, and BURNS, District Judge.[*]

## OPINION

MERRILL, Circuit Judge:

Plaintiff seeks to recover taxes paid by him under the Interest Equalization Tax Act of 1964.[1] His claim is that imposition of the tax upon the transactions involved constituted a violation of due process, in that the application of the tax to those transactions was retroactive. In the district court, following trial, judgment for the United States was entered. Purvis v. United States, 344 F.Supp. 785 (W.D.Wash.1972). This appeal was taken by the taxpayer.

On July 18, 1963, President Kennedy in a message to Congress[2] proposed a series of coordinated actions to alleviate a serious balance of payments deficit. Included was an "interest equalization tax" to be levied on purchases by Americans of foreign securities, the purpose being to restrict long term capital outflow from the United States by making it more expensive to borrow in the American market. The President in his message made it clear that if the tax was to achieve its purpose, it was essential that legislation creating the tax be made effective as of the date of the presidential message—July 18, 1963. Otherwise a rush by investors to beat the deadline would serve to aggravate

the problem and render the proposal self-defeating.[3]

The President's message was well publicized in the newspapers and financial journals. The market in foreign securities was promptly affected. On the day of the message the Treasury Department issued documents giving details of the proposed tax. A "Notice of Proposed Effective Date" with a description of the proposed Act was published in the Federal Register on August 16, 1963. The Act in substantially the form proposed by the President was signed into law September 2, 1964, with an effective date of July 18, 1963.

Plaintiff taxpayer, a resident of the State of Washington, had for many years invested in Canadian securities and maintained a margin brokerage account in the Victoria, British Columbia, office of a Canadian brokerage firm. Between July 18, 1963, and August 2, 1964, he purchased various Canadian stocks. The purchases were made through his Canadian account, to which no United States dollars were transferred during the period in question. Thus, although taxpayer purchased foreign securities during the period between the effective date and enactment —the period of retroactive application —he did not, during that period, contribute to outflow of capital from the United States.

In engaging in the stock purchases in question taxpayer knew of the Presi-

---

[*] Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

1. Pub.L.No.88–563, § 2(a), 78 Stat. 809, adding Chapter 41 to Subtitle D, Internal Revenue Code of 1954 (codified at 26 U.S.C. §§ 4911 et seq.).

   26 U.S.C. § 4911 provides in relevant part:
   "*Imposition of tax*
       (a) *In general.*—There is hereby imposed, on each acquisition by a United States person * * * of stock of a foreign issuer, or of a debt obligation of a foreign obligor * * *, a tax determined under subsection (b).
       (b) *Amount of tax.*—
       (1) *Rates of tax.*—* * *

   (A) *Stock.*—The tax imposed by subsection (a) on the acquisition of stock shall be equal to 15 percent of the actual value of the stock."
   Section 2(c) of Pub.L.No.88–563 provided in part:
   "*Effective Date.*—
       (1) *General Rule.*—* * * * [T]he amendments made by this section shall apply with respect to acquisitions of stock and debt obligations made after July 18, 1963."

2. H.R.Doc.No.141, 88th Cong., 1st Sess.; 109 Cong.Reg. 12806 (Senate), 12940 (House) (1963).

3. 109 Cong.Rec. at 12809, 12943.

dent's message and of his desire for retroactive application, and the reason for that desire. He knew of nothing in the proposals that would exempt his transactions. He knew that the tax as proposed would cover foreign security purchases paid for with foreign funds of Americans. He joined with other investors in unsuccessful efforts to have the tax modified by Congress to exclude transactions not involving "outflow." [4]

■ Taxpayer recognizes that modifications of income taxes have regularly been imposed retroactively, as discussed in Welch v. Henry, 305 U.S. 134, 59 S. Ct. 121, 83 L.Ed. 87 (1938). He insists, however, that the law is otherwise as to new and novel taxes upon transactions theretofore free from taxation. He relies upon decisions holding unconstitutional retroactive application of estate and gift taxes: Coolidge v. Long, 282 U.S. 582, 51 S.Ct. 306, 75 L.Ed. 562 (1931); Untermyer v. Anderson, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928); Blodgett v. Holden, 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927); Nichols v. Coolidge, 274 U.S. 531, 47 S. Ct. 710, 71 L.Ed. 1184 (1927). Taxpayer concludes from these authorities and from the Court's discussion of the problem in Welch v. Henry, *supra,* that retroactivity can be sanctioned only if the tax is not imposed upon a voluntary act, or if the taxpayer is forewarned of retroactivity by the statute books themselves or by previous practices of Congress.

These contentions, with respect to this same tax, were advanced by a taxpayer and rejected by the Court of Claims in First National Bank in Dallas v. United States, 420 F.2d 725, 190 Ct.Cl. 400, cert. denied, 398 U.S. 950, 90 S.Ct. 1868, 26 L.Ed.2d 289 (1970). The court there stated that it could "perceive no such

rigid standard of constitutionality in the decided cases." It further stated:

"We are guided, rather, by the more flexible criteria delineated by the Supreme Court in Welch v. Henry, *supra,* 305 U.S. at page 147, 59 S.Ct. at 126:

\* \* \* In each case it is necessary to consider the *nature of the tax* and the *circumstances in which it is laid* before it can be said that its retroactive application is *so harsh and oppressive* as to transgress the constitutional limitation. [Emphasis supplied (by the Court of Claims).]

Accordingly, it is our view that where there is reasonable cause to believe or expect that a tax will be imposed upon a presently nontaxable transaction, the restrospective application of such tax does not constitute a denial of due process."

420 F.2d at 730.

We agree with that view.

Taxpayer here seeks to distinguish *First National Bank in Dallas* in that in that case there had been an outflow of funds to Canada caused by the purchases of the taxpayer, while in this case there was none. Taxpayer asserts that while he did indeed have notice that Congress contemplated applying the tax to such cases (purchases made with funds already located abroad), he had no notice that the tax would be retroactively applied to such transactions. He protests that such notice as was given of the retroactive application of the Act was coupled with notice of the need for such application—to prevent frustration of the tax's purpose by massive outflow of funds in response to a desire to beat the deadline. While he acknowledges, arguendo, the validity of Congress' jus-

---

4. Congress rejected such modifications for a variety of reasons: that such exemptions would enlarge the pool of foreign securities which United States persons could trade free of tax among themselves; that they would give undue advantage to United States persons who had previously acquired foreign funds over those who had not; that they would encourage United States persons with foreign funds to invest in foreign securities rather than United States securities; that they would create administrative difficulties in enforcing the tax; that they could create multiple exchange rates; that there would be a loss of revenue.

tification for extending the tax to include foreign transactions with foreign funds (see note 4, *supra*), he insists that there was no need whatsoever to apply the tax retroactively to such transactions. Since the funds were already out of the country there obviously could be no need to rush to get them out of the country to beat any deadline and as to those funds there was therefore no need for retroactive application of the tax.

We may accept that there was no need.[5] We cannot agree, however, that lack of need was the same as lack of notice that the tax would be so applied. From the outset the public was on notice that the tax as defined was (by presidential exhortation, at least) to be retroactively imposed across the board. Never was there any reliable suggestion that it would become effective on different dates for different transactions depending upon the source of funds.

■ We conclude, as did the Court of Claims, that with the widespread notice given to the investing public it cannot be said that retroactive application of this tax was oppressive or harsh or confiscatory. With the undeniable need for retroactive application in general if the purpose of the tax was to be realized, it cannot be said that retroactive application of the tax was arbitrary or capricious. Since general retroactive application cannot be said to violate due process, we are satisfied that taxpayer had no constitutional right to have certain transactions carved out to be subjected to prospective application only.

Taxpayer makes a further argument which we feel warrants discussion. Notice, he insists, in order to suffice under *Welch v. Henry, supra,* must have been by the statute books themselves or by the practice of Congress. He points to language in Untermeyer v. Anderson, *supra*:

"The taxpayer may justly demand to know when and how he becomes liable for taxes—he cannot foresee and ought not to be required to guess the outcome of pending measures. The future of every bill while before Congress is necessarily uncertain. The will of the lawmakers is not definitely expressed until final action thereon has been taken."

276 U.S. at 445–446, 48 S.Ct. at 354.

Taxpayer contends that to give the President's request for retroactive application the effect of legislative notice is to put the investor on the horns of a dilemma since he cannot foresee whether Congress will grant the request or not. Further, he contends, to give such effect to the President's request is to countenance a violation of the principle of separation of powers.

■ However, it was not the act of the President that gave retroactive application to the tax measure. It was the action of Congress that did so. In United States v. Heinszen & Co., 206 U.S. 370, 27 S.Ct. 742, 51 L.Ed. 1098 (1907), and Mattingly v. District of Columbia, 97 U.S. 687, 24 L.Ed. 1098 (1878), the Court early recognized the power of Congress to ratify unauthorized Executive action taken in the area reserved to Congress, and thus retroactively to validate such action. We feel we can confidently leave to Congress, as a purely political matter, the control of such instances of interaction between the departments. If at any time the Congress feels the President to be overreaching in seeking to create legislative consequences from Executive proclamation or request, it can reject the request for retroactive application.

■ It is true that this uncertainty as to outcome—as to whether certain transactions are to be taxed, and, if so, whether retroactively—can create diffi-

---

5. We note, however, that at least one of the considerations which led Congress to decline to exempt such "no outflow" transactions from the tax generally (see note 4, *supra*), namely, the avoidance of administrative difficulties, also militated strongly against exempting such transactions from the retroactive feature.

culties for an affected citizen attempting to order his life, business or property. Here again, however, we feel that the proper due process test is that stated in *Welch*: "the nature of the tax and the circumstances in which it is laid" are to be taken into balance in determining whether the uncertainty imposed upon the investor is "so harsh and oppressive as to transgress the constitutional limitation." We do not find that to be the case here.

Judgment affirmed.

WALLACE, Circuit Judge (dissenting):

I respectfully dissent.

The majority threads a delicate course in discussing case authority as it upholds the retroactive application of the Interest Equalization Tax Act of 1964. In doing so, it brushes aside too lightly the obvious distinctions between the present case and the prior cases it cites which upheld retroactive taxation. The majority rejects the taxpayer's argument "that retroactivity can be sanctioned only if the tax is not imposed upon a voluntary act, or if the taxpayer is forewarned of retroactivity by the statute books themselves or by previous practices of Congress." The majority draws comfort from the Court of Claims which, when faced with the same issue as we have before us found that the Supreme Court in Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938), had not established such a "rigid standard of constitutionality" and upheld the tax. First Nat'l Bank v. United States, 420 F.2d 725, 730, 190 Ct.Cl. 400, cert. denied, 398 US. 950, 90 S.Ct. 1868, 26 L.Ed.2d 289 (1970). The correct test as established by the Supreme Court, the majority asserts, is "to consider the nature of the tax and the circumstances in which it is laid" before determining its constitutionality. The majority and the Court of Claims both ignore the fact that in *Welch,* the Court reaffirmed its prior

holding declaring retroactive taxes unconstitutional where the taxpayer might well have refrained from the conduct creating the tax liability, "had anticipated the tax . . . ." 305 U.S. at 147, 59 S.Ct. 121. In addition, the *Welch* Court distinguished Coolidge v. Long, 282 U.S. 582, 51 S.Ct. 306, 75 L. Ed. 562 (1931); Untermyer v. Anderson, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928), and Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927), which held retroactive taxes unconstitutional, from the case before it on the ground that it could not assume that the taxpayer would have refused to receive the income even if he had known that it "would later be subject to a new tax or to the increase of an old one." 305 U.S. at 148, 59 S.Ct. at 126. The tax upheld in *Welch* was an income tax on corporate dividends. Prior to the enactment of the tax this source of income had essentially been free from taxation. The law became effective in 1935 but imposed a tax upon income earned in 1933 and 1934. The law specifically declared "that the levy was an emergency tax to provide revenue for relief purposes . . . ." 305 U.S. at 142, 59 S.Ct. at 123.

By comparison, the interest equalization tax is primarily regulatory. As the majority states, its purpose was "to restrict long term capital outflow from the United States by making it more expensive to borrow in the American market." The raising of revenue was only an incidental benefit. Given this statement of purpose, the retroactive application of the tax cannot be justified on the ground that the taxpayer would have conducted his affairs exactly the same even if he had absolute knowledge the tax would be retroactively applied. From a realistic point of view, if the taxpayer were sure of taxation, he may well have not continued to invest in the foreign market since the tax was so substantial as practically to eliminate the likelihood of a profit.[1] Because of this,

---

1. The tax imposed range from 15% to 22.5% of the value of the foreign stocks acquired. The relevant language of the statute reads:

(a) In general.—There is hereby imposed, on each acquisition by a United States person . . . of stock of a for-

the retroactive application of the tax can be upheld only if the taxpayer had sufficient notice that his conduct would be subject to a regulatory tax.

The majority concludes that the taxpayer had ample notice because the President's request for the tax was well publicized and known generally among investors. In addition, the President had specifically requested that the tax be retroactive. Nevertheless, the majority slides over the fact that many Presidents have requested a great deal of legislation which has never seen the light of day; to do so, it rationalizes that Congress ratified the executive action when it made the tax retroactive, citing United States v. Heinszen & Co., 206 U. S. 370, 27 S.Ct. 742, 51 L.Ed. 1098 (1907), and Mattingly v. District of Columbia, 97 U.S. 687, 24 L.Ed. 1098 (1878).

Ratification, however, is not involved in this case and the majority's authority is, therefore, of no assistance on the issue of adequate notice. In *Heinszen*, the Supreme Court articulated the principle of ratification as follows:

That where an agent, without precedent authority, has exercised, in the name of a principal, a power which the principal had the capacity to bestow, the principal may ratify and affirm the unauthorized act, and thus retroactively give it validity when rights of third persons have not intervened, is so elementary as to need but statement. That the power of ratification as to matters within their authority may be exercised by Congress, state governments, or municipal corporations, is also elementary.

206 U.S. at 382, 27 S.Ct. at 745. The *Heinszen* Court held that Congress had the power to ratify a system of tariff duties imposed by the President upon goods coming into the Philippine Islands. The Court stated that the President had imposed and collected the tariffs without authority but concluded that the action was valid because of the subsequent ratification by Congress. Similarly in *Mattingly*, the Court upheld assessments laid, without authority, by a board of public works where Congress subsequently ratified the action.

These cases would be persuasive authority in the present case if the President had actually levied and collected the interest equalization tax. But he did not take such drastic action; he merely requested Congress to enact the tax. This distinction is significant because of the effect the two different courses of conduct have upon the manner in which a taxpayer conducts his business affairs. Where the President takes action, even without authority, the effect is immediate and certain. The taxpayer is required either to alter his course of conduct or to pay the tax. If the President's action is subsequently ratified, the taxpayer has at least had the benefit of certainty in arranging his affairs. If the action is held to be illegal he can recover the tax he has paid.

On the other hand, where the President merely requests Congress to take action, regardless of how well publicized the request is, the effect is postponed and uncertain. The Congress may reject the request altogether or may modify it to the extent that it only faintly resembles the President's original pro-

---

eign issuer . . . a tax determined under subsection (b).

(b) Amount of tax.—

(1) Rates of tax.—Except as provided in paragraphs (2) and (3)—

(A) Stock.—The tax imposed by subsection (a) on the acquisition of stock shall be equal to 15 percent of the actual value of the stock.

.   .   .   .   .

(3) Rates during interim period.—In the case of acquisitions of stock . . . made after January 25, 1967, and before the thirtieth day after the date of the enactment of this paragraph, the tax imposed by subsection (a) shall be 22.5 percent in the case of acquisition of stock

.   .   .

26 U.S.C. § 4911.

posal. It would be harsh and arbitrary to expect a person to arrange his affairs on the basis of such a request. If he declines to invest because of a Presidential request for legislation which is not forthcoming, he has no conceivable remedy for the loss he may have suffered.

The present case is almost identical to *Untermyer v. Anderson*, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928). The Revenue Act of 1924, 43 Stat. 313, imposed a tax on all gifts made any time during the calendar year of 1924, but did not become effective until June 2, 1924. Prior to its decision in *Untermyer*, the Court held the tax unconstitutional as applied to a gift made in January, 1924, on the ground that it was so arbitrary as to be a denial of due process. *Blodgett v. Holden*, 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927). In that case, the Court stated that "[i]t seems wholly unreasonable that one who, in entire good faith and without the slightest premonition of such consequence, made absolute disposition of his property by gifts should thereafter be required to pay a charge for so doing." 275 U.S. at 147, 48 S.Ct. at 106. In *Untermyer*, the Court considered the constitutionality of the same tax as applied to a gift made on May 23, 1924, just 12 days before the Act was approved by the President. The government argued that as retroactively applied to this gift the tax was not unconstitutional because the taxpayer had ample notice of the proposed tax and, in all likelihood, had made the gift at that particular time to avoid tax liability. The government pointed out that the gift was made three months after the proposed tax had been presented and while the conference report was still pending. The Court rejected the argument, holding the retroactive application of the tax unconstitutional. The Court stated:

> The mere fact that a gift was made while the bill containing the questioned provisions was in the last stage of progress through Congress we think is not enough to differentiate this cause from the former one and to relieve the legislation of the arbitrary character there ascribed to it. To accept the contrary view would produce insuperable difficulties touching interpretation and practical application of the statute, and render impossible proper understanding of the burden intended to be imposed. The taxpayer may justly demand to know when and how he becomes liable for taxes—he cannot foresee and ought not to be required to guess the outcome of pending measures. The future of every bill while before Congress is necessarily uncertain. The will of the lawmakers is not definitely expressed until final action thereon has been taken.

276 U.S. at 445–446, 48 S.Ct. at 354.

The taxpayer in the present case, like the taxpayer in *Untermyer*, may have had ample notice of the proposed tax. But as the Court stated, he should not be required to guess on what the legislative outcome would be. This holding seems particularly appropriate in the present case because the taxpayer was required to guess the legislative outcome of the tax through the entire legislative process, whereas in *Untermyer* the tax had already passed both houses of Congress and awaited only the conference report, final congressional approval and the signature of the President.

I would hold the tax as applied to the transactions involved in this case unconstitutional.