Rose SIDNEY, Petitioner,

v.

·COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Morris BRECHER, Petitioner,

v.

·COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Molly BRECHER, Petitioner,

v.

·COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Susan BRECHER, Petitioner,

v.

·COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Arthur WOHL and Bernice Wohl,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Alfred WOHL and Sheila Wohl,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

·Charles K. ITCHKOW and Sadie Itchkow,
Petitioners,

v.

·COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Kenneth ITCHKOW, Petitioner,

v.

·COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Nos. 82–89, Dockets 25621–25628.

United States Court of Appeals
Second Circuit.

Argued Dec. 10, 1959.

Decided Jan. 6, 1960.

Ernest R. Field, New York City (Warshaw & Franks, New York City, Mishler & Wohl, Long Island City, N. Y., and Fried, Beck, Tannenbaum & Field, New York City, on the brief), for petitioners.

David O. Walter, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, and Harry Baum, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and SWAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Taxpayers' petitions seek review of a decision of the Tax Court upholding determinations of the Commissioner that certain distributions to taxpayers as stockholders in two corporations, Kew Terrace, Inc., and Kew Terrace No. 2 Corp., in 1950 and 1951 were taxable "as gain from the sale or exchange of property which is not a capital asset" under § 117(m) relating to collapsible corporations, added to the Internal Revenue Code of 1939 on September 23, 1950, by § 212 of the Revenue Act of 1950, Ch. 994, 64 Stat. 906, 26 U.S.C.A. § 117(m). Some of the points advanced by the taxpayers have already been determined against them by this Court; others require a further expression of our views. Since we find these points also to be without merit, we affirm the judgment of the Tax Court.

Judge Kern's opinion, 30 T.C. 1155, relates the facts in detail. Hence only the briefest summary is needed here.

In January, 1949, the Federal Housing Administration issued commitments for some $3,006,000 of mortgage insurance for two projects in Queens, each consisting of a group of apartment buildings. In February and April, 1949, Kew Terrace, Inc. and Kew Terrace No. 2 Corp. were organized to construct these. In March and April, 1949, Kew Terrace and No. 2 Corp. issued stock to the taxpayers, purchased the land, and arranged temporary mortgage financing in an amount equal to the FHA insurance commitment. In March, 1949, the Greenwich Savings Bank agreed to become permanent mortgagee upon completion of the projects and to pay each corporation a substantial premium for placing the FHA insured mortgage with it. This permanent financing was effected, and

the premiums—some $62,000 to Kew Terrace and $43,000 to No. 2 Corp.—were paid, on February 16, 1950.

Construction commenced in the spring of 1949. By August 31, the records of the two corporations indicated the probability that the costs of construction would be substantially less than the amount available under the FHA insured financing. The buildings were completed at various dates in the latter part of 1949; all were finished before the end of the year. The receipts under the building loan agreements exceeded the construction costs (excluding the cost of the land) by some $693,000 and the total costs (including the cost of the land) by some $379,000.

On January 26, 1950, the directors of Kew Terrace voted to increase its capital surplus by some $540,000, the difference between the original FHA appraisal of the building and actual construction costs. On the following day the directors voted a distribution of $270,000 to stockholders; this was paid to petitioners on January 30, 1950. A second distribution, of $58,000, was voted and paid on August 17, 1951.

On February 16, 1950, the directors of No. 2 Corp. voted to increase its capital surplus by some $406,000, the difference between the original FHA appraisal of the building and the actual construction costs. On the next day the directors voted a distribution of $192,000, which was paid to petitioners as owners of all the common stock. A second distribution,

of $35,000, was voted and paid on August 17, 1951.

In their income tax returns for 1950 and 1951 petitioners reported so much of these distributions as were attributable to the excess mortgage proceeds and the mortgage premiums as gains in respect of a capital asset. The District Director of Internal Revenue sent 30-day letters to petitioners proposing to tax this portion of the 1950 and 1951 distributions under § 117(m) of the 1939 Internal Revenue Code. These were followed by protests, notices of deficiency, and petitions to, hearing before and adverse decision by the Tax Court.

■ We can deal summarily with the contentions of the three petitioners Itchkow that the burden of proof in the Tax Court was on the Commissioner because of the absence of specific mention of § 117(m) in the statutory notices of deficiency sent to them and the characterization therein of the cash distributions as ordinary income. The same point was decided by this Court against the taxpayer in Sorin v. Commissioner, 271 F. 2d 741, affirming 1958, 29 T.C. 959; and even if a different conclusion were to be reached on this point, we would not come to a different final result.

■ A second contention is that the Tax Court erred in finding that the distributions had been made prior to the realization by the corporations "of a substantial part of the net income to be derived from such property," as required by § 117(m) which we quote in the margin.[1] Taxpayers claim the mortgage

---

1. "(1) Treatment of gain to shareholders. Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) Definitions.

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or avail-

ed of principally for the manufacture, construction, or production of property, * * * or for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing, the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property."

premiums received from the Greenwich Savings Bank were such "a substantial part." A difference of opinion has developed in the Tax Court whether the statute is applicable if, at the time of the sale or exchange, the corporation has realized "a substantial part of the net income to be derived from such property" but a "substantial part" remains unrealized. James B. Kelley, 1959, 32 T.C. 135 (five judges dissenting), now on appeal. Judge Kern, who was later to write the opinion in Kelley which answered that question in the negative, nevertheless found § 117(m) applicable here. He held that the mortgage premiums, although net income of the corporations, were not "net income to be derived from such property," namely the apartment houses. We agree, and therefore do not reach the question that divided the Tax Court in the Kelley case.

■ Taxpayers' next challenge is to the Tax Court's finding that they entertained the "view" specified in § 117(m) during the period of construction. Judge Kern applied the criterion, stated in § 29.117-11 of Treasury Regulations 111 under the Internal Revenue Code of 1939, that "A corporation is formed or availed of with a view to the action described in § 117(m) (2) (A) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section." If § 117(m) in fact required the existence of the "view" at that time, we would not disturb the finding of the Tax Court on this record, even if we should agree with August v. C.I.R., 3 Cir., 1959, 267 F. 2d 829, 833, that such a finding "is but a legal inference from the facts and subject to review free of the restraining influence of the 'clearly erroneous' rule applicable to ordinary finding of fact made by the trial court." However, the Fourth Circuit held, in Burge v. Commissioner, 1958, 253 F.2d 765, 769, that it sufficed if the view existed when the corporation was "availed of." Plainly, taxpayers here had the specified view by that time. In Glickman v. Commissioner, 2 Cir., 1958, 256 F.2d 108, we agreed with the interpretation in Burge, although we found that on the facts in Glickman the "view" was formed before construction was completed.

■ Taxpayers rely heavily on contentions with respect to retroactivity. Section 212(b) of the Revenue Act of 1950, approved on September 23, 1950, 26 U.S.C.A. § 117 note, provided that the new § 117(m) "shall be applicable to taxable years ending after December 31, 1949, but shall apply only with respect to gain realized after such date." Taxpayers stress that here the corporations finished construction during 1949 and that each corporation made its first and larger distribution early in 1950. They say that in no reported § 117(m) case except August v. Commissioner, supra, had construction been completed prior to January, 1950, that no reported § 117 (m) case except Glickman dealt with gains realized prior to September 23, 1950, and that neither in August nor in Glickman was the issue of retroactivity raised. They insist they cannot have had a "view" referred to in § 117(m) before it was enacted and certainly not before the earliest date to which it was made effective. They argue further that § 117 (m) should not be construed to apply when the "view" antedated enactment and that any such application would violate the due process clause of the Fifth Amendment.

Petitioners' claim that they cannot have entertained a "view" referred to in the statute before it was enacted has no foundation in fact. Taxpayers entertain views on many subjects not mentioned in revenue acts existing at the time. The thrust of petitioners' argument is rather that, in the absence of clear direction by the legislature, courts ought not construe a statute as attaching new consequences to views held prior to enactment, since if they do, the statute may violate constitutional safeguards. These generalities do not avail taxpayers here. For Congress made it clear beyond peradventure that it intended § 117(m) to apply to all gains realized after December 31, 1949, and this required that significance

be given to views held prior to September 23, 1950, when the Revenue Act of 1950 became law. We therefore could not interpret the statute as inapplicable even if we had greater doubts as to its constitutionality as so interpreted than we do.

■ Taxpayers' due process argument is founded upon Untermyer v. Anderson, 1928, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 holding that the gift tax provided in the Revenue Act of June 2, 1924, 43 Stat. 253, 313, could not be constitutionally applied to a gift made on May 23, 1924. Mr. Justice Holmes and Mr. Justice Brandeis wrote dissenting opinions. Each agreed with the other and Mr. Justice Stone agreed with both. The Supreme Court has distinguished the case on six occasions[2] and has expressly followed it only once.[3] If Untermyer remains authority at all, it is so only for the particular situation of a wholly new type of tax there under consideration. Mr. Justice Brandeis thought the Untermyer decision itself defied authority since "for more than half a century, it has been settled that a law of Congress imposing a tax may be retroactive in its operation," 276 U.S. at page 447, 48 S.Ct. at page 355. Notable among the cases which he cited was Brushaber v. Union Pacific R. R., 1916, 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493, upholding in that respect the Act of October 3, 1913, 38 Stat. 114, 166, which taxed all income received after March 1, 1913, the Sixteenth Amendment having been promulgated on February 25 of that year. Some of the Supreme Court decisions distinguishing Untermyer v. Anderson may themselves be distinguishable here as dealing with estate taxation, where the taxable event, the death of the taxpayer, although hardly avoidable, came after the law that created new estate tax consequences for things already done. But Welch v. Henry, 1938, 305 U.S. 134, 147, 59 S.Ct. 121, 83 L.Ed. 87, sustaining a Wisconsin tax on corporate dividends retroactive from March 1935 to 1933, cannot be disposed of on that ground and is pertinent here. The distribution in the instant case was of a sort long subject to Federal income taxation; § 117(m) changed the law only as to the category of income and consequently the rate. We do not underestimate the practical importance of this, but the years since Untermyer have emphasized the truth of Mr. Justice Holmes' remark, 276 U.S. at page 446, 48 S.Ct. at page 354. "We all know that we shall get a tax bill every year," and taxpayers have learned to conduct themselves on that basis. We think it was generally known, long before the turn of 1949, that 1950 would probably see a new Revenue Act; indeed, President Truman's message recommending enactment of a bill including provision for the taxation of gains realized from collapsible corporations was sent on January 25, 1950. Hearings before Committee on Ways & Means on Revenue Revision of 1950, 81st Cong.2d Sess. 2, 5 (1950). We therefore reject petitioners' due process argument.

Judgment affirmed.

2. Welch v. Henry, 1938, 305 U.S. 134, 147, 59 S.Ct. 121; Reinecke v. Smith, 1933, 289 U.S. 172, 175, 53 S.Ct. 570, 77 L. Ed. 1109; Gwinn v. Commissioner, 1932, 287 U.S. 224, 229, 53 S.Ct. 157, 77 L.Ed. 270; Milliken v. United States, 1931, 283 U.S. 15, 21, 51 S.Ct. 324, 75 L.Ed. 809; Graham v. Goodcell, 1931, 282 U.S. 409, 426, 51 S.Ct. 186, 75 L.Ed. 415; Cooper v. United States, 1930, 280 U.S. 409, 412, 50 S.Ct. 164, 74 L.Ed. 516.

3. Coolidge v. Long, 1931, 282 U.S. 582, 586, 596, 51 S.Ct. 306, 75 L.Ed. 562. Mr. Justice Roberts dissented, in an opinion in which Justices Holmes, Brandeis and Stone concurred.