**Jerry W. CARLTON, Executor of the Will of Willametta K. Day, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**No. 91–55590.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1992.

Decided Aug. 10, 1992.

---

Russell G. Allen, O'Melveny & Myers, Newport Beach, Cal., for plaintiff-appellant.

Teresa E. McLaughlin, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant-appellee.

Before: ALARCON, NORRIS, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We consider whether retroactive application of an amendment to the federal estate tax portion of the Internal Revenue Code violates due process.

## I

On October 22, 1986, the Tax Reform Act of 1986 ("TRA") became law. One provision of the TRA allowed an estate to deduct half of the proceeds of a sale of securities to an Employee Stock Ownership Plan ("ESOP") from a decedent's gross estate ("the ESOP proceeds deduction"). *See* 26 U.S.C. § 2057[1] (repealed 1989). The result of the ESOP proceeds deduction was to remove half of the estate from the reach of the federal estate tax, to the extent the estate was comprised of money received from the sale of stock to an ESOP. This deduction, codified at section 2057 of the Internal Revenue Code, was available to any estate that could timely file its return after the enactment date of the TRA, irrespective of the date of death of the decedent. *See* 26 U.S.C. § 2057(c)(1).

The 99th Congress adjourned on October 18, 1986. Between passage by Congress of the TRA on September 27, 1986 and adjournment, Congress considered hundreds of potential technical and clerical amendments to the TRA, but only one proposed amendment related to section 2057: deletion of an extraneous "is." Furthermore, the parties have stipulated that "[n]o bill or resolution was introduced that would have added any condition to the availability of the new [s]ection 2057 deduction other than those contained in the statute itself during the period between passage of the TRA and adjournment on October 18, 1986."

Willametta K. Day died on September 29, 1985. Because of an extension of the filing deadline not at issue here, her estate tax return was not due until December 29, 1986. As a matter of timeliness, the Day estate was potentially eligible for the ESOP proceeds deduction contained in section 2057.

Carlton was executor of the Day estate. He reviewed the TRA and determined that it was in the interest of the estate to utilize the new ESOP proceeds deduction. The parties have stipulated that *in specific re-*

---

1. Sec. 2057. SALES OF EMPLOYER SECURITIES TO EMPLOYEE STOCK OWNERSHIP PLANS OR WORKER–OWNED COOPERATIVES.

(a) *General Rule.*—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate an amount equal to 50 percent of the qualified proceeds of a qualified sale of employer securities.

(b) *Qualified Sale.*—For purposes of this section, the term "qualified sale" means any sale of employer securities by the executor of an estate to—

   (1) an employee stock ownership plan ... described in section 4975(e)(7), or
   (2) an eligible worker-owned cooperative (within the meaning of section 1042(c)).

(c) *Qualified Proceeds.*—For purposes of this section—

   (1) *In general.*—The term "qualified proceeds" means the amount received by the estate from the sale of employer securities at any time before the date on which the return of the tax imposed by section 2001 is required to be filed (including any extensions).

   (2) *Proceeds from certain securities not qualified.*—The term "qualified proceeds" shall not include the proceeds from the sale of

any employer securities if such securities were received by the decedent—

   (A) in a distribution from a plan exempt from tax under section 501(a) which meets the requirements of section 401(a), or
   (B) as a transfer pursuant to an option or other right to acquire stock to which section 83, 422, 422A, 423, or 424 applies.

(d) *Written Statement Required.*—

   (1) *In general.*—No deduction shall be allowed under subsection (a) unless the executor of the estate of the decedent files with the Secretary the statement described in paragraph (2).

   (2) *Statement.*—A statement is described in this paragraph if it is a verified written statement of—

   (A) the employer whose employees are covered by the plan described in subsection (b)(1), or
   (B) any authorized officer of the cooperative described in subsection (b)(2),

consenting to the application of section 4979A with respect to such employer or cooperative.

(e) *Employer Securities.*—For purposes of this section, the term "employer securities" has the meaning given such term by section 409(1).

(f) *Termination.*—This section shall not apply to any sale after December 31, 1991.

*liance on the newly enacted section 2057,* Carlton purchased 1,500,000 shares of MCI stock on December 10, 1986 at an average price of $7.47 per share, for a total price of $11,206,000. Carlton chose to buy MCI shares because the trustee of the MCI ESOP had expressed an interest in purchasing MCI shares. At the time Carlton bought the shares, however, the MCI ESOP had not entered into any legally binding agreement to buy them from him; hence, the estate bore the risk of loss if the market in MCI stock declined. Two days later, the MCI ESOP agreed to buy the shares from the estate at $7.05 per share, which was about 26 cents *below* the mean market price that day, as well as below the price at which the shares were purchased. As part of the agreement, the MCI ESOP provided documentation that it was a qualifying ESOP as required under section 2057. *See* 26 U.S.C. § 2057(e). The total sale price was $10,575,000, or $631,000 below Carlton's purchase price. The government concedes that Carlton would not have sold the shares at a discount—and consequently the MCI ESOP would not have been able to acquire shares at a discount—if not for the section 2057 deduction.

On December 29, 1986, Carlton duly filed the estate tax return, in which he deducted $5,287,500 from the gross estate pursuant to the ESOP proceeds deduction. On be-

half of the estate, Carlton paid a net estate tax of $18,752,250.

On January 5, 1987, the Internal Revenue Service ("IRS") issued an advance version of Notice 87–13, which stated, inter alia, that "[p]ending the enactment of clarifying legislation," the IRS would not recognize a deduction pursuant to section 2057 unless the decedent had "directly owned" the securities before death ("the decedent ownership requirement"). Notice 87–13 was formally published on January 26, 1987. The government concedes that the decedent ownership requirement announced in Notice 87–13 was not contained in section 2057 as originally enacted in 1986, was not contained in any amendments to the TRA passed before the 99th Congress adjourned, nor was it in any of the proposed technical and clerical amendments to the TRA considered by the 99th Congress.

On February 26, 1987, a bill was introduced in the new 100th Congress to enact into law the decedent ownership requirement as announced in Notice 87–13 ("the 1987 amendment"). The bill eventually became law on December 22, 1987, and applied the decedent ownership requirement retroactively as if the TRA as originally enacted had contained such a requirement. *See* Pub.L. No. 100–203 § 10411,[2] 101 Stat. 1330, 1330–432 (1987). The 1987 amendment was labeled a "Congressional Clarifi-

2. SEC. 10411. CONGRESSIONAL CLARIFICATION OF ESTATE TAX DEDUCTION FOR SALES OF EMPLOYER SECURITIES.

(a) *Intent of Congress in Enacting Section 2057 of the Internal Revenue Code of 1986.*—Section 2057 (relating to sales of employer securities to employee stock ownership plans or worker-owned cooperatives) is amended by redesignating subsections (d), (e), and (f) as subsections (e), (f), and (g), respectively, and by inserting after subsection (c) the following new subsection:

(d) *Qualified Proceeds From Qualified Sales.*—
(1) *In general.*—For purposes of this section, the proceeds of a sale of employer securities by an executor to an employee stock ownership plan or an eligible worker-owned cooperative shall not be treated as qualified proceeds from a qualified sale unless—
(A) the decedent directly owned the securities immediately before death, and
(B) after the sale, the employer securities—

(i) are allocated to participants, or
(ii) are held for future allocation in connection with
(I) an exempt loan under the rules of section 4975, or
(II) a transfer of assets under the rules of section 4980(c)(3).
(2) *No substitution permitted.*—For purposes of paragraph (1)(B), except in the case of a bona fide business transaction (e.g., a substitution of employer securities in connection with a merger of employers), employer securities shall not be treated as allocated or held for future allocation to the extent that such securities are allocated or held for future allocation in substitution of other employer securities that had been allocated or held for future allocation.
(b) *Effective Date.*—The amendments made by subsection (a) shall take effect as if included in the amendments made by section 1172 of the Tax Reform Act of 1986.

---

cation of Estate Tax Deduction for Sales of Employer Securities" and its legislative history included a Committee Report statement:

> As drafted, the estate tax deduction was significantly broader than what was originally contemplated by Congress in enacting the provision. The committee believes it is necessary to conform the statute to the original intent of Congress in order to prevent a significant revenue loss under the [TRA].

H.R.Rep. No. 100–391(II), 100th Cong., 1st Sess. 1045 (1987), *reprinted in* 4 U.S.C.C.A.N. 2313–1, 2313–661 (1987).

The Day estate's tax return was audited, and the IRS determined a deficiency of $3,385,333. The net deficiency attributable to the disputed ESOP proceeds deduction was $2,501,161. Carlton does not dispute the remaining deficiency.

Carlton paid the total deficiency plus $996,953.18 in interest. On July 3, 1989, he filed a refund claim for that part of the deficiency attributable to the ESOP proceeds deduction. The IRS denied the refund claim. On October 11, 1990, Carlton filed a refund action in district court for $2,501,161 plus interest, costs, and attorneys' fees.

Carlton moved for summary judgment on stipulated facts, and the government moved to dismiss with prejudice, which the district court construed as a motion for summary judgment. The parties agreed to an order narrowing the potential issues in controversy. The government conceded that the estate was entitled to the ESOP proceeds deduction under section 2057 as passed in 1986, and that if the 1987 amendment could not be retroactively applied consistent with due process, that Carlton was entitled to judgment. Carlton conceded that if the 1987 amendment could be retro-

actively applied to his transaction, the estate would not be entitled to the ESOP proceeds deduction, that there would be no other basis for claiming the refund, and that the government would be entitled to judgment.

The district court granted the government's motion for summary judgment. The district court determined that the retroactive application of the 1987 amendment to the MCI ESOP transaction did not violate due process because the 1987 amendment did not impose a "wholly new tax." The district court also rejected Carlton's Contract Clause and Takings Clause arguments, and Carlton does not press those points on appeal.

## II

■ Whether a statute may be applied retroactively consistent with the Due Process Clause is a question of law, and thus we review the district court's determination on this issue de novo. *Licari v. Commissioner*, 946 F.2d 690, 692 (9th Cir. 1991).

## III

### A

■ Over the past half-century the Supreme Court has consistently stated a single standard to determine if a tax statute may be applied retroactively consistent with the Due Process Clause.[3] Courts "must 'consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation.'" *United States v. Hemme*, 476 U.S. 558, 568–69, 106 S.Ct. 2071, 2078, 90 L.Ed.2d 538 (1986) (quoting *Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 125, 83 L.Ed. 87

---

**3.** Under long-standing judicial construction, the Ex Post Facto Clause does not apply here because this is not a criminal prosecution. "Although the Latin phrase '*ex post facto*' literally encompasses any law passed 'after the fact,' it has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applied only to penal statutes which disadvantage the offender affected by them." *Collins v.*

*Youngblood*, 497 U.S. 37, ——, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798)). *See also Valley Wood Preserving, Inc. v. Paul*, 785 F.2d 751, 754 (9th Cir.1986) ("The ex post facto clause is limited to criminal proceedings and therefore has no application [to a land use ordinance].").

(1938)); *accord United States v. Darusmont*, 449 U.S. 292, 299, 101 S.Ct. 549, 553, 66 L.Ed.2d 513 (1981) (per curiam) (court's inquiry is "whether a particular tax is so harsh and oppressive as to be a denial of due process").[4] Outside of the tax context, the constitutional standard is often stated differently: a retroactive application of a statute must be "arbitrary and irrational" to violate due process. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The Supreme Court has made clear, however, that the "harsh and oppressive" standard used in the tax context "does not differ from the prohibition against arbitrary and irrational legislation that we clearly enunciated in *Turner Elkhorn.*" *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733, 104 S.Ct. 2709, 2720, 81 L.Ed.2d 601 (1984).

█ We are instructed to "consider the nature of the tax and the circumstances in which it is laid." We "perceive no ... rigid standard of constitutionality in the decided cases.... We are guided, rather, by the more flexible criteria delineated by the Supreme Court in Welch v. Henry...." *Purvis v. United States*, 501 F.2d 311, 313 (9th Cir.1974) (quotations omitted), *cert. denied*, 420 U.S. 947, 95 S.Ct. 1329, 43 L.Ed.2d 425 (1975). Accordingly, we reject the notion of a per se rule that tax statutes can *never* be retroactively applied. The Supreme Court has "made clear that some retrospective effect is not necessarily fatal to a revenue law." *Hemme*, 476 U.S. at 568, 106 S.Ct. at 2077. Thus, retroactivity alone will not condemn a congressional enactment.

By the same token, we also reject the notion of a per se rule that tax statutes can *always* be retroactively applied so long as they do not enact a "wholly new" tax. The Supreme Court's two most recent decisions regarding retroactivity challenges to tax statutes, *Hemme* and *Darusmont*, did not involve wholly new taxes. Despite that fact, the Court engaged in a thorough

analysis of the circumstances of each retroactive application before making its determination of constitutionality. This clearly indicates that retroactive application of the tax laws is not "automatically" permitted so long as a wholly new tax is not involved.

Thus, we consider whether, under "the circumstances in which it is laid," the retroactive application of the 1987 amendment of section 2057 to the MCI ESOP transaction is "so harsh and oppressive" as to violate due process. An examination of previous challenges to the constitutionality of the retroactive application of tax statutes helps to elucidate the factors we must consider in our determination.

In *Nichols v. Coolidge*, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927), the Supreme Court held a retroactive application of the federal estate tax to be unconstitutional. Mrs. Coolidge had transferred property to a trust in 1907. Income on the trust was to be paid to Mrs. Coolidge and her husband, and after they had both died the corpus of the trust was to be divided among Mrs. Coolidge's children or their representatives. In 1919, Congress amended the federal estate tax to include within its ambit transfers made prior to death that were " 'intended to take effect in possession or enjoyment at or after ... death.' " *Id.* at 539, 47 S.Ct. at 712 (quoting Act of February 24, 1919, § 402(c)). Such transfers were to be taxed at their value at the time of the transferor's death. Congress also expressly stated that such provision applied "whether such transfer or trust is made or created before or after the passage of this Act." *Id.* Mrs. Coolidge died in 1921 and the Commissioner of Internal Revenue sought to include within the gross taxable estate the present value of the trust corpus. Mrs. Coolidge, of course, had no notice that the trust corpus would be taxed as part of her estate when she created the trust in 1907. The Court also emphasized that "[a]n excise is prescribed, but the amount of it is made to depend upon past lawful transactions, not testa-

---

4. It can hardly be said that these 1981 and 1986 cases, upon which we rely, "reach back to the *Lochner* era." *See* dissent at 1062.

mentary in character and beyond recall." *Id.* at 542, 47 S.Ct. at 714–15. Thus, the Court concluded that the retroactive application of the 1919 amendment was "so arbitrary and capricious as to amount to confiscation and offend the Fifth Amendment." *Id.*

The next Term, the Supreme Court again faced a challenge to the retroactive application of a federal tax statute. In *Blodgett v. Holden*, 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927), four members of the Court viewed a retroactive application of the federal gift tax as violative of due process.[5] Blodgett made gifts in January 1924. The gift tax provision in question was presented to Congress for consideration on February 25, 1924, and approved on June 2, 1924. The plurality pointed out that the gifts had been made before the new statute was even pending before Congress. It concluded that "[i]t seems wholly unreasonable that one who, in entire good faith and without the slightest premonition of such consequence, made absolute disposition of his property by gifts should thereafter be required to pay a charge for so doing." *Id.* at 147, 48 S.Ct. at 106 (opinion of McReynolds, J.).

Later in the same Term, the Court revisited the question of the retroactive application of the 1924 federal gift tax legislation. In *Untermyer v. Anderson*, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928), the gift was made on May 23, 1924. Hence, unlike in *Blodgett*, the gift was made after Congress had begun consideration of the legislation, although still before such legislation was enacted. Nonetheless, the Court still found the retroactive application to offend due process.

> The mere fact that a gift was made while the bill containing the questioned provisions was in the last stage of progress through Congress we think is not enough to differentiate this cause from [*Blodgett*] and to relieve the legislation of the arbitrary character there ascribed to it.... The taxpayer may justly demand

to know when and how he becomes liable for taxes—he cannot foresee and ought not to be required to guess the outcome of pending measures. The future of every bill while before Congress is necessarily uncertain.

*Id.* at 445–46, 48 S.Ct. at 354.

This court too has held that a federal tax as applied was unconstitutionally retroactive. *See Wheeler v. Commissioner*, 143 F.2d 162, 168 (9th Cir.1944), *rev'd on other grounds*, 324 U.S. 542, 65 S.Ct. 799, 89 L.Ed. 1166 (1945). In reliance on the Revenue Act of 1938, the shareholders of the John H. Wheeler Company dissolved the corporation and distributed its assets proportionately among themselves. Under the Revenue Act of 1938, the capital gains of the dissolved corporation were measured for tax purposes as if the corporation had bought all its assets at market value. That is, the basis of certain assets was taken as the market value at the time the assets were transferred from shareholders to corporation. The Second Revenue Act of 1940, however, purported to change the rule retroactively for corporations liquidated under the Revenue Act of 1938. Under the 1940 Act, the corporation assumed the transferor-shareholder's basis, rather than taking as its basis the market value at the time of transfer. This court held that the Second Revenue Act of 1940 had not "come within the next session of the legislature [following passage of the 1938 Act] or within a reasonable length of time" and hence could not be retroactively applied to the Wheelers' 1938 corporate dissolution consistent with due process. *Id.* at 168.

We have recently stated that "[f]ederal courts have long been hostile to legislation that interferes with settled expectations." *Licari*, 946 F.2d at 693. Still, it cannot be gainsaid that the modern trend has been against successful challenges to retroactive applications of the tax statutes. In three modern cases, the Supreme Court has re-

---

5. This opinion by Justice McReynolds was joined by Chief Justice Taft and Justices Van Devanter and Butler. Justice Holmes, joined by Justices Brandeis, Sanford and Stone, was of the view that the statute could be read to not

apply retroactively, thus avoiding the constitutional question. No vote is recorded for Justice Sutherland, and thus the Court was evenly divided on this issue.

jected due process challenges to retroactive applications of revenue acts.

In *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938), the challenged revenue act retroactively imposed a tax on certain dividend income that had formerly been excluded from taxation. There was no indication that the taxpayer had incurred any extra expenses or in any other way changed his conduct in reliance on the tax law as it stood before retroactive amendment. In holding the retroactive tax constitutional, the Court observed, "[w]e can not assume that stockholders would refuse to receive corporate dividends even if they knew that their receipt would later be subjected to a new tax or to the increase of an old one." *Id.* at 148, 59 S.Ct. at 126. The Court stated, however, that a different case would be presented where a transaction was taxed that was "completely vested before the enactment of the taxing statute," and "the nature or amount of the tax could not reasonably have been anticipated by the taxpayer at the time of the particular voluntary act which the statute later made the taxable event." *Id.* at 147, 59 S.Ct. at 125.

In *United States v. Darusmont*, 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981) (per curiam), the taxpayer unsuccessfully challenged the retroactive application of a change in the minimum tax that increased the tax on an already completed sale of real property. Far from relying on the pre-amendment law, the taxpayer "conceded ... that when he was considering the various ways in which he could dispose of the Texas property, he was *not aware* of the existence of the minimum tax." *Id.* at 295, 101 S.Ct. at 551 (emphasis added). The Court further observed that the taxpayer was "hardly in a position to claim surprise at the 1976 amendments to the minimum tax. The proposed increase in rate had been under public consideration for almost a year before its enactment." *Id.* at 299, 101 S.Ct. at 553. Also significant was that the 1976 amendments merely "decreas[ed] the allowable exemption and

increas[ed] the percentage rate of tax." *Id.* at 300, 101 S.Ct. at 553.

In *United States v. Hemme*, 476 U.S. 558, 106 S.Ct. 2071, 90 L.Ed.2d 538 (1986), the retroactive application of a transitional rule [6] to gifts made before its enactment was challenged on due process grounds. In concluding that due process was not violated, the Court put great weight on the fact that the taxpayers were "no worse off than they would have been without the enactment of the Act." *Id.* at 570, 106 S.Ct. at 2079. The Court noted that even under the retroactive operation of the transitional rule, the taxpayers "still have paid estate taxes of $655.16 *less* than they would have paid had the 1976 Act never been passed" and that accordingly "the retroactive aspect of the law could not be said to be oppressive or inequitable." *Id.* at 571, 106 S.Ct. at 2079. The Court also found it significant that "§ 2035 had long been in effect at the time [the decedent] made his gift, and it is § 2035 that contains the principal retroactive feature involved in this case, requiring the estate to reach back and embrace a gift made over two years previously." *Id.*

This court recently decided a challenge to an increase in the penalty rate from 10% to 25% for underpayment of tax liability, retroactively applied to tax returns filed before the date of enactment where penalties had not yet been assessed as of the enactment date. *Licari*, 946 F.2d at 692. We concluded that the retroactive aspect of the statute was rational because it served to make those who were trying to cheat "reimburs[e] the government for [the] heavy burden of investigative and prosecutorial costs incident to ferreting out tax underpayment." *Id.* at 695. We were careful to point out, however, that:

> [h]ere, *we are not presented with a case in which an individual acted in accordance with the law as it stood at the time* only later to be subjected to a penalty; instead, those subjected to the increased penalties, like the Licaris, knew at the time that they filed their returns that

---

**6.** The transitional rule was "enacted to bridge the old and new regimes for the federal taxation of gifts and estates." *Hemme,* 476 U.S. at 560, 106 S.Ct. at 2073.

they were not acting in accordance with the law and could be subjected to a fine.... Under these circumstances, we do not find imposition of the increased penalty unduly "harsh and oppressive."

*Id.* at 695 (emphasis added).

**B**

■ From these cases, two circumstances emerge as of paramount importance in determining whether the retroactive application of a tax is unduly harsh and oppressive. First, did the taxpayer have actual or constructive notice that the tax statute would be retroactively amended? Second, did the taxpayer rely to his detriment on the pre-amendment tax statute, and was such reliance reasonable? We address each question in turn.

■ It is undisputed that Carlton had no actual notice of the 1987 amendment imposing the decedent ownership requirement when he completed the MCI ESOP transaction in 1986. Nor is there any basis upon which Carlton could have had constructive notice of the future imposition of the decedent ownership requirement. The Day estate completed its transaction before the end of December 1986. The IRS first proposed that section 2057 be amended to include a decedent ownership requirement on January 5, 1987. The bill that included the 1987 amendment was introduced in Congress on February 26, 1987. Moreover, the government concedes that the decedent ownership requirement was not "identified in the proposed technical and clerical amendments discussed before Congress adjourned," and was not "added to the statute (although other changes to the TRA were made) before Congress adjourned" on October 18, 1986. Hence, no act of the executive or legislative branch would have given any forewarning of the 1987 amendment at the time the MCI ESOP transaction occurred.

The government argues, however, that the legislative history of the TRA should have put Carlton on constructive notice that Congress had intended to include a decedent ownership requirement in section 2057, and that an amendment imposing such a requirement was surely in the offing. The government, however, can only point to two passing references in congressional documents in support of its view. Both of these references merely state that the ESOP proceeds deduction would be *available* to a decedent who sold his company to an employee group. The government can point to no place in the legislative history that states that the ESOP proceeds deduction would be *limited* to such a situation.

Further, one of these passing references was in a pamphlet written by the staff of the Joint Committee on Taxation in September 1985. The pamphlet does not purport to speak for Congress or even a congressional committee, and was prepared over a year before passage of the TRA. Its value as legislative history is doubtful. The other passing reference is a floor statement made by Senator Russell Long, which was at best ambiguous.[7] We have no trouble concluding that these two fleeting references—each of which merely stated that section 2057 would encourage decedents to sell their own companies to an ESOP—did not give constructive notice to Carlton that an amendment imposing a decedent ownership requirement would be forthcoming.

■ Next, we turn to the second important factor, whether Carlton reasonably and detrimentally relied on section 2057 as enacted in 1986. That Carlton specifically relied on the ESOP proceeds deduction contained in the new section 2057 in deciding to pursue the MCI transaction is undoubted. Indeed, the government has so stipulated. While this fact is uncontested, it should not be overlooked. The very fact that Carlton engaged in a costly transaction for no other reason than the inducement provided by the new section 2057 makes this case significantly different from those rejecting a due process chal-

---

**7.** Interestingly, while the government argues that this statement gave constructive notice to Carlton, the government itself was apparently unaware of it at the time it filed its brief and only brought it to our attention on the eve of oral argument.

lenge to a retroactively applied revenue law.

Indeed, to say that the estate merely "relied" on section 2057 understates the circumstances of this case. The federal government has long sought to promote employee ownership of shares in their employers. Section 2057 was enacted to induce taxpayers to sell shares at a discounted price to an ESOP, thus furthering the public policy of employee ownership. As intended, the Day estate succumbed to the lure and sold shares to the MCI ESOP at a substantial discount. Section 2057 worked. An ESOP was able to buy more shares at a lower price than before. Then, when the private actor had completed the socially desirable action of selling shares at a discount to an ESOP, the government reneged on its end of the deal. It was too late for Carlton to undo his sale to the MCI ESOP. The $631,000 was gone forever, irretrievable.

The government urges, however, that while Carlton's reliance on the ESOP proceeds deduction is undoubted, it was not reasonable. At the core of this argument is the notion that section 2057 as originally enacted was such a windfall, any reasonable taxpayer would have known it was "too good to be true." We flatly reject the government's premise that a taxpayer cannot rely on the clear and unequivocal text of the tax code, but instead must speculate on the unspoken and inchoate intentions of Congress.

Moreover, viewed in the context of the other huge tax incentives that Congress has created to encourage the development of ESOPs, section 2057 should not have raised any eyebrows, even as first enacted in 1986. According to the Joint Committee on Taxation,

> [t]he tax expenditure for qualified plans is the largest single item of tax expenditures. For the fiscal year 1986, the tax expenditure for employer maintained qualified plans (including Keogh plans) is estimated to be $56.8 billion and this expenditure is projected to increase to $88.9 billion for fiscal year 1990.

Staff of Joint Comm. on Taxation, 99th Cong., 1st Sess., Tax Reform Proposals: Tax Treatment of Employee Stock Ownership Plans (ESOPs) 21 n. 29 (Comm. Print 1985). The total annual tax expenditure of section 2057 if it had *not* been amended in 1987 was estimated by the Joint Committee on Taxation at $1.4 billion. *See* 133 Cong. Rec. H845 (Feb. 26, 1987) (statement of Rep. Rostenkowski citing the Joint Comm. on Taxation); *id.* at S2532 (statement of Sen. Bentsen citing the Joint Comm. on Taxation). Although ESOPs are just one type of "qualified plan," a term which also includes pension and profit-sharing plans, this tax expenditure of $1.4 billion does not appear incredible in the context of a total tax expenditure to promote employee investment of $56.8 billion. Thus, even if it were reasonable to expect that before a taxpayer would take a deduction plainly available to him under the tax code, he would research the estimated tax expenditure associated with such deduction, the tax expenditure created by the ESOP proceeds deduction as originally enacted was entirely plausible.

Carlton had little reason to think Congress had made a drafting error. After all, the ESOP proceeds deduction was not added to the TRA in a frenzied last minute effort. Section 2057 had first been proposed over two and a half years before the TRA was finally passed. As approved by the Senate Finance Committee in March 1984, section 2057 did not have a decedent ownership requirement. Sen. Comm. on Finance, 98th Cong., 2d Sess., 2 Deficit Reduction Act of 1984, Statutory Language of Provisions Approved by the Committee on March 21, 1984, at 338 (Comm. Print 1984). Thus, it cannot be seriously argued that the decedent ownership requirement was inadvertently omitted in a last minute drafting error.

Congress has given several substantial tax incentives to ESOPs over the years. When a bank loans money to an ESOP to finance the purchase of shares, half of the interest income from such loans is excluded from taxable income. *See* 26 U.S.C. § 133. Taxpayers who sell shares to an ESOP may defer for tax purposes the recognition of

any capital gain on such sale. *See* 26 U.S.C. § 1042. In this context, section 2057's provision allowing half of the proceeds of a sale of shares to an ESOP to be excluded from the taxable estate would not have appeared out of line.

■ The government nevertheless argues that any reliance by the estate on the new section 2057 was not truly detrimental in any event. This argument has two aspects. First, the government argues that the availability of any deduction under the tax code is an act of legislative grace, and that the 1987 amendment imposing the decedent ownership requirement simply restored the estate to the position it would have been in had Congress not made the "mistake" of passing section 2057 in 1986 without the decedent ownership requirement. This is simply not correct. The estate essentially "paid" $631,000 (plus transactions costs such as brokerage and attorney fees) to receive the $2.5 million reduction in tax liability. Unlike *Welch*, where the tax preference for Wisconsin corporations having been ended the taxpayer was merely restored to the position he would have been in had such preference never been enacted, here, the taxpayer is *not* restored to the status quo ante, but suffers a loss. It is true that the payment of the $2.5 million in taxes makes the estate's *tax liability* no worse than it would have been if the ESOP proceeds deduction had never been enacted in the first place. But this begs the question. It fails to account for the actual loss suffered by the estate. To truly return the estate to the status quo ante, the government would have to pay it $631,000. We are persuaded that this is a critical distinction from *Hemme* where, even with the retroactive application of the new tax statute, the taxpayer was still better off than he would have been under the old regime.

Second, the government contends that a loss by the estate was not a prerequisite under section 2057 to qualify for the ESOP proceeds deduction, and so should not be considered in determining whether retroactive application of the decedent ownership requirement is unduly harsh and oppressive. That is, selling the shares to the ESOP *at a discount* from the market price is not one of the statutorily defined requirements to qualify for the ESOP proceeds deduction.

One need not be an economist, however, to perceive that in practice the only way to have obtained the deduction was for the estate to offer to "share" it with the other party necessary to the transaction, the ESOP. Under section 2057, the estate must file with the IRS certification from the ESOP that the ESOP meets certain requirements. *See* 26 U.S.C. § 2057(e). Because the ESOP must provide such certification, it necessarily knows the circumstances under which the sale is being made and the substantial tax deduction the estate will be receiving. Moreover, there is no way of going around the ESOP; its cooperation is essential. In this situation, it is manifest that any rational ESOP can and will demand some part of the tax break in the form of a discounted share price. The MCI ESOP had to have some incentive to deal with Carlton, given the extra paperwork required, rather than just purchase its shares on the open market. Selling the shares at a discount from the market price was not an error or miscalculation on Carlton's part, but instead a necessary concession to complete the deal.

We believe that the estate's reliance on the plain language of section 2057 was reasonable in light of the lack of any indication that an amendment was in the offing and in the context of the large tax incentives Congress has given to ESOPs. Further, the detriment to the estate is obvious. The 1987 amendment did not merely restore the status quo before the TRA. The estate was out $631,000.

■ The government argues that the MCI ESOP transaction was a sham, that it had no substance. We disagree. The substance was in the transfer of wealth from the Day estate to the MCI ESOP. The Day estate was $631,000 poorer after the transaction than it was before. The MCI ESOP now owns more shares than it would have had it only been able to purchase shares on the open market. The permanently

changed positions of the parties show that the transaction had substance and reality.

■ We do not doubt the power of Congress to apply legislation retroactively to the time such legislation was introduced, or even to the time such legislation was proposed by the executive branch. *See Purvis*, 501 F.2d at 313–14 (retroactive application of "interest equalization tax" on American purchases of foreign securities to the time when first proposed by the President does not violate due process). During this time period, the taxpayer is on notice that a change in law is forthcoming. The government has a strong interest in capturing within its taxing powers transactions deliberately rushed through in anticipation of a pending change of law. Our conclusion would likely be entirely different if Carlton had engaged in his transaction after January 5, 1987. *See Ferman v. United States*, 790 F.Supp. 656 (E.D.La.1992) (rejecting claim that decedent ownership requirement was unconstitutionally applied to transaction in February 1987).

Having considered the nature of the 1987 amendment and the circumstances in which it was laid, we conclude that, as applied here, such amendment is "so harsh and oppressive as to transgress the constitutional limitation." Carlton had no notice, actual or constructive. The estate entered into a transaction that cost it over $600,-000, based solely on the inducement of a tax deduction the government now wants to take away.

### IV

We hold that the 1987 amendment to the federal estate tax imposing a decedent ownership requirement on the ESOP proceeds deduction formerly contained at 26 U.S.C. § 2057, as applied to the transaction at issue here, violated the Due Process Clause of the Fifth Amendment. The parties have stipulated that if such amendment could not be retroactively applied to the transaction here consistent with the Constitution, "then the taxpayer is entitled to judgment as sought in the complaint." Accordingly, we reverse the judgment of the district court and remand with instruc-

tions to enter judgment in favor of the plaintiff.

REVERSED and REMANDED with INSTRUCTIONS.

NORRIS, Circuit Judge, dissenting:

The majority recognizes that "the modern trend has been against successful challenges to retroactive applications of the tax statutes." Majority at 1057. Indeed, in order to find Supreme Court precedent for striking down retroactive taxation, the majority opinion, like the petitioner's brief, was forced to reach back to the *Lochner* era. My reading of contemporary case law leads me to a different conclusion: Congress did not offend the constitutional requirement of due process when it retroactively applied the "decedent ownership requirement" to an estate tax provision encouraging Employee Stock Ownership Plans (ESOPs). I accordingly dissent.

In regulating economic activity, Congress enjoys wide latitude to legislate retroactively. The Supreme Court explains that

> the strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches....

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984). This principle applies with full force to the tax laws, where courts may step in only when " 'retroactive application is so harsh and oppressive as to transgress the constitutional limitation.' " *United States v. Hemme*, 476 U.S. 558, 568–69, 106 S.Ct. 2071, 2077, 90 L.Ed.2d 538 (1986) (quoting *Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 125, 83 L.Ed. 87 (1938)). Measured against this high standard, the 1987 amendment to the Tax Reform Act of 1986 should be upheld.

The facts of *Welch v. Henry* provide an appropriate starting point for interpreting the "harsh and oppressive" standard that the opinion articulates. The taxpayer's income in that case derived mostly from dividends paid by corporations doing a majority of their business in Wisconsin. *Welch,* 305 U.S. at 141, 59 S.Ct. at 122. Wisconsin's income tax statutes treated such dividend income extremely favorably until, in 1935, the state imposed additional taxes, to be applied retroactively to dividends paid in 1933 and 1934. *Id.* at 143, 59 S.Ct. at 124. Although the Court had previously struck down retroactive taxes on gifts, *see Nichols v. Coolidge,* 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184 (1927), *Blodgett v. Holden,* 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927), *Untermyer v. Anderson,* 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928), it upheld this statute on the basis that "a tax on the receipt of income is not comparable to a gift tax," but more properly resembles property taxes and benefit assessments of real estate, where retroactivity had been found appropriate. *Id.* 305 U.S. at 147–48, 59 S.Ct. at 125–26. The Court reasoned that bestowing a gift is the "voluntary act of the taxpayer," which it contrasted with receiving corporate dividends: "We can not assume that stockholders would refuse to receive corporate dividends even if they knew that their receipt would later be subjected to a new tax or to the increase of an old one." *Id.* Because the decision to invest in stocks whose dividends receive favorable tax treatment is, of course, voluntary, the distinction between the taxpayer in *Welch* and those in *Nichols, Blodgett,* and *Untermyer* lies in the difference between *Welch's* economic and the others' eleemosynary motives for the acts that gave rise to tax liability. *Welch's* dividends were a form of consideration in exchange for his investment in Wisconsin corporations, and receipt of consideration was, in the Court's sense of the word, involuntary.

Carlton's case closely resembles *Welch's*. Carlton structured the financial affairs of Mrs. Day's estate to take advantage of favorable tax treatment for sales of stock to ESOPs. Likewise, *Welch's* portfolio had been structured to exploit the special treatment accorded dividends from Wisconsin corporations. In Carlton's case, as in *Welch's*, the taxing authority that had created the special tax benefits grew concerned about their drain on the public fisc and retroactively eliminated them. In *Welch's* case, the retroactive law was a sharp departure from a long history of favorable treatment for investments in Wisconsin corporations. *Welch,* 305 U.S. at 142–43, 59 S.Ct. at 123. Carlton's case is arguably less sympathetic because the retroactive law, in closing a loophole in the new ESOP deduction provision, merely restored the status quo that Carlton faced a year earlier.

Cases decided since *Welch* have upheld retroactive taxes on a variety of economic transactions, sharply limiting the scope of the *Lochner*-era cases. *See, e.g., United States v. Hemme,* 476 U.S. 558, 106 S.Ct. 2071, 90 L.Ed.2d 538 (1986) (retroactive application of the transitional rule for federal gift and estate taxes upheld); *United States v. Darusmont,* 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981) (per curiam) (retroactive increase in the minimum tax upheld); *Wiggins v. Commissioner,* 904 F.2d 311 (5th Cir.1990) (upheld retroactive exclusion of investment tax credit recapture when calculating alternative minimum tax); *Estate of Ekins v. Commissioner,* 797 F.2d 481 (7th Cir.1986) (retroactive repeal of an estate tax exclusion for life insurance policies upheld); *Fein v. United States,* 730 F.2d 1211 (8th Cir.), *cert. denied,* 469 U.S. 858, 105 S.Ct. 188, 83 L.Ed.2d 121 (1984) (same); *Estate of Ceppi v. Commissioner,* 698 F.2d 17 (1st Cir. 1983), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3088, 77 L.Ed.2d 1350 (1983) (retroactive repeal of estate tax exclusion upheld); *Westwick v. Commissioner,* 636 F.2d 291 (10th Cir.1980) (retroactive changes in the minimum tax upheld in spite of detrimental reliance); *Purvis v. United States,* 501 F.2d 311 (9th Cir.), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1329, 43 L.Ed.2d 425 (1975) (interest equalization tax on foreign stock acquisitions may be retroactively applied); *First National Bank in Dallas v. United*

*States,* 420 F.2d 725, 190 Ct.Cl. 400 (1970) (same); *Sidney v. Commissioner,* 273 F.2d 928 (2d Cir.1960) (Friendly, J.) (retroactive taxation of gains realized from collapsible corporations upheld).

Most of these cases have limited *Nichols, Blodgett,* and *Untermyer* to their facts, or at least to retroactive imposition of a wholly new tax, as opposed to a change in the base or rate of an existing tax. *Hemme,* 476 U.S. at 568, 106 S.Ct. at 2077; *Darusmont,* 449 U.S. at 299, 101 S.Ct. at 553; *Wiggins,* 904 F.2d at 314; *Estate of Ekins,* 797 F.2d at 484; *Fein,* 730 F.2d at 1213; *Estate of Ceppi,* 698 F.2d at 21; *Westwick,* 636 F.2d at 292; *First Nat'l Bank in Dallas,* 420 F.2d at 730 n. 8; *Sidney,* 273 F.2d at 932. The Ninth Circuit decided *Purvis v. United States* on the narrower ground that a presidential speech proposing the retroactive tax had put the taxpayer on notice of the subsequent change, so that retroactive application was not "harsh and oppressive." 501 F.2d at 314–15.

The Supreme Court and our sister circuits have made clear, however, that constructive notice to the taxpayer is usually implied for a change in the rate or basis of an existing tax. In the words of the Seventh Circuit, "a change in the tax rate is considered by its very nature to be reasonably foreseeable." *Estate of Ekins v. Commissioner,* 797 F.2d 481, 484 (7th Cir. 1986). "Legislative changes are to be expected, and the taxpayer assumes the risk that the tax burden on a particular transaction may increase pursuant to Congress' continual responsibility to carry out the necessary policies of taxation." *Id.* at 483 (citing *Milliken v. United States,* 283 U.S. 15, 23, 51 S.Ct. 324, 327, 75 L.Ed. 809 (1931)). *Accord Fein v. United States,* 730 F.2d 1211, 1213 (8th Cir.), *cert. denied,* 469 U.S. 858, 105 S.Ct. 188, 83 L.Ed.2d 121 (1984). Our court once considered the point so obvious that it disposed of a challenge to retroactive repeal of an income tax loss carry-forward provision in a single paragraph. We called that tax provision "a matter of legislative grace ... within the power of Congress to revoke" retroactively. *Miller v. Commissioner,* 115 F.2d 479, 480 (9th Cir.1940). Under this analy-

sis, we should imply constructive notice of the tax code amendment, which retroactively abolished the fifty percent deduction for proceeds from an ESOP stock sale but levied no wholly new taxes. The majority, in reaching a different conclusion, creates a split among the circuits, as well as a conflict with our own, older precedent.

In addition to taxes that are wholly new and therefore completely unforeseeable, the Supreme Court has suggested that retroactive taxes that "attempt to reach events [too] far in the past" are harsh and oppressive. *Welch v. Henry,* 305 U.S. 134, 148, 59 S.Ct. 121, 126, 83 L.Ed. 87 (1938). Congress has long enacted revenue laws that retroactively tax income and assets from the entire year in which the new statute is passed, and in some instances from the calendar year preceding the year of the new legislation's enactment. *United States v. Darusmont,* 449 U.S. 292, 296, 101 S.Ct. 549, 551, 66 L.Ed.2d 513 (1981) (per curiam). The courts have upheld this "customary congressional practice" as "required by the practicalities of producing national legislation." *Id.* at 297, 101 S.Ct. at 552. The circuits have split on whether retroactive taxes may reach back before the calendar year that precedes the year of their enactment. Curative legislation, passed to effectuate the original intent of Congress, has been granted greater leeway. *See, e.g. New England Baptist Hospital v. United States,* 807 F.2d 280, 285 (1st Cir.1986) (four years of retroactive effect upheld for curative legislation); *accord Canisius College v. United States,* 799 F.2d 18, 26–27 (2d Cir.), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987); *accord Temple University v. United States,* 769 F.2d 126, 135 (3d Cir.), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2914, 91 L.Ed.2d 544 (1986); *cf. Wheeler v. Commissioner,* 143 F.2d 162, 166 (9th Cir.), *rev'd on other grounds,* 324 U.S. 542, 65 S.Ct. 799, 89 L.Ed. 1166 (1945) (tax statute with two years' retroactive application struck down). We need not reach that dispute here, however, where the period of retroactive application for the revenue measure includes the calendar year in which it

was passed and only a few months of the preceding year.[1]

The majority's opinion substitutes a test much more sympathetic to the taxpayer than those that courts have used in the past. It asks (1) whether the taxpayer had actual or constructive notice of the specific retroactive provision, and (2) whether the taxpayer reasonably relied to his detriment on the tax code as written at the time of his transaction. While maximum fairness to taxpayers might argue that Congress should legislate according to this generous standard, the Supreme Court has declined to adopt it as a requirement of Due Process.

The taxpayer in *Darusmont* suggested two tests that resemble those the majority uses here. First he asked, could the taxpayer "have altered his behavior to avoid the tax if it could have been anticipated by him at the time the transaction was effected?" 449 U.S. at 299, 101 S.Ct. at 553. The majority's inquiry into detrimental reliance is the same test more elegantly stated, but the Supreme Court rejected it as based on the old gift tax cases, which had no precedential value for retroactive taxes on income. *Id.* Detrimental reliance is essentially a creature of contract law, where the theory of promissory estoppel vests rights in a party that reasonably relies on another's promise. Restatement (Second) of Contracts § 90 (1981). Contractual analogies, the Supreme Court tells us, are inapposite in tax cases:

'[t]axation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract. It is but a way of apportioning the cost of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens. Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process, and to challenge the present tax it is not enough to point out that the taxable event ... antedated the statute.'

United States v. Darusmont, 449 U.S. 292, 298, 101 S.Ct. 549, 552, 66 L.Ed.2d 513 (1981) (per curiam) (quoting *Welch v. Henry*, 305 U.S. 134, 146–47, 59 S.Ct. 121, 125, 83 L.Ed. 87 (1938)).

Darusmont's second test was whether the taxpayer lacked "actual or constructive notice" of the retroactive legislation. The Court's per curiam opinion did not directly address the appropriateness of this inquiry, as the facts of Darusmont's case indicated notice aplenty. The Court did, however, cite approvingly a couple of its earlier cases upholding retroactive taxation where notice had not been demonstrated. *Id.* 449 U.S. at 299, 101 S.Ct. at 553 (citing *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938)), *Id.* 449 U.S. at 300, 101 S.Ct. at 553 (citing *Cooper v. United States*, 280 U.S. 409, 50 S.Ct. 164, 74 L.Ed. 516 (1930)). And two other circuits have interpreted an earlier Supreme Court case as inferring constructive notice whenever a tax code revision alters the rate or basis for an existing tax. *Estate of Ekins v. Commissioner*, 797 F.2d 481, 483 (7th Cir. 1986) (citing *Milliken v. United States*, 283 U.S. 15, 23, 51 S.Ct. 324, 327, 75 L.Ed. 809 (1931)); *accord Fein v. United States*, 730 F.2d 1211, 1213 (8th Cir.), *cert. denied*, 469 U.S. 858, 105 S.Ct. 188, 83 L.Ed.2d 121 (1984).

In any event, were I to apply the majority's test to this case, I would be less willing to find that, at the time he arranged the purchase and sale of MCI stock, Carlton lacked constructive notice that a future retroactive amendment might render the Day estate ineligible for the ESOP deduction. Nor would I find his reliance on the statute as originally passed to have been reasonable. True, the plain language of the 1986 provision allowed Carlton to benefit from the transaction he arranged. But several factors indicated that Congress would not be satisfied with its original work and might act to curtail the benefit within a short time after its enactment.

First, the available legislative history indicates that the original intent of Congress

---

1. The amendment retroactively applying the decedent ownership requirement was introduced in the 100th Congress on February 26, 1987. It became law on December 22, 1987, and applied as of October 22, 1986, the day when the Tax Reform Act it modified was originally enacted.

had been to allow "stockholders to sell their companies to their employees who helped them build the company." Staff of the Joint Committee on Taxation, 99th Cong., 2d Sess., *Tax Reform Proposals: Tax Treatment of Employee Stock Ownership Plans (ESOPs)* at 37 (Comm. Print 1985). The majority correctly points out that this statement highlights a class of decedent owners, but does not *limit* the deduction to them. If, however, Congress had meant to allow any estate willing to undertake a relatively low-risk securities transaction to benefit from the ESOP proceeds deduction, then examples of decedent owners selling to their employees would be an infinitesimal proportion, not a prototypical example, of the beneficiaries of the rule. Any estate executor would have difficulty resisting the temptation to purchase securities on the open market and promptly resell them at below market to an ESOP in order to reduce estate taxes. Had Congress understood the scope of the provision it had drafted, the measure's opponents would surely have raised more important concerns than the tracing problems for lifetime sales that the legislative history mentions as the chief argument against the deduction. *Id.* The estimated revenue loss from the estate tax provision as drafted— some $7 billion—was more than 20 times the $300 million loss Congress had contemplated. Appellee's Brief at 26.

Second, the statute on its face offered a benefit that appeared "too good to be true." Admittedly, a number of laws provide tax incentives to encourage the growth of ESOPs, in some cases subsidizing third parties for facilitating the transfer of employer securities to an ESOP. For example, a 1984 provision gives a taxpayer who sells an ESOP stock in a closely held corporation the right to roll over his or her capital gains by reinvesting in other securities. 26 U.S.C. § 1042. Although this provision gives the taxpayer an incentive to sell to an ESOP rather than on the open market, it offers those who sell to ESOPs no tax advantages over those who continue to hold their original investment, and thus should cost the U.S. Treasury little. Another provision that benefits ESOPs through subsidies to third parties allows a bank to exclude from taxation fifty percent of interest income for any loan made to an ESOP. 26 U.S.C. § 133. Note that the loss to the Treasury from this provision leverages tremendous funds: At a ten percent interest rate, every nickel of tax base the Treasury loses lands a dollar in the pocket of an ESOP. In contrast, the estate tax provision that Carlton employs saps fifty cents of estate tax base without guaranteeing *any* benefit for the ESOP. True, the ESOP's bargaining leverage should enable it to shave off for itself a piece of the estate's tax benefit. But the outcome of this case, where the ESOP saved $631,000 in purchasing employer stock, while the Treasury lost $2,501,161 in estate taxes, demonstrates that the deduction as drafted offered a subsidy of a wholly different magnitude from existing provisions. Congress could more providently have underwritten ESOP stock purchases directly from the U.S. Treasury without bringing in estate executors as middlemen!

I recognize that, if this case raised a question of statutory interpretation, neither the provision's legislative history nor its unfortunate economic effects could detract from the plain meaning of the text. *See Connecticut Nat'l Bank v. Germain,* — U.S. ——, at ——, 112 S.Ct. 1146, at 1149, 117 L.Ed.2d 391 (1992). But this case does not require us to interpret the 1986 statute, only to inquire whether Congress, in amending it, acted in an arbitrary and capricious manner, or "so harsh[ly] and oppressive[ly] as to transgress the constitutional limitation." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 733, 104 S.Ct. 2709, 2719, 81 L.Ed.2d 601 (1984). Because Congress's retroactive legislation limited the scope of a loophole that had been in effect just over one year, it did not transgress that boundary.